UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

R<small>ALPH</small> W<small>ASHINGTON</small>, #305686,

      Plaintiff,                        Hon. Jane M. Beckering

v.                                     Case No. 1:22-cv-86

S<small>HANE</small> J<small>ACKSON</small>,

      Defendant.
_____/

**REPORT AND RECOMMENDATION**

This matter is before the Court on Defendant's Motion for Summary Judgment. (ECF No. 48). Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendant's motion be granted and this action terminated.

**BACKGROUND**

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Brooks Correctional Facility (LRF) where the events giving rise to this action occurred. Plaintiff initiated this action against Warden Shane Jackson. Plaintiff alleges that between February 2020 and March 2021, Jackson failed to take appropriate action to protect Plaintiff and other prisoners from contracting COVID-19. Plaintiff further alleges that he contracted COVID-19 as a result of Jackson's failures. Asserting that Jackson's actions violate his Eighth and Fourteenth Amendment rights, Plaintiff seeks $5,500,000.00 in damages. Plaintiff further

-1-

requests that he be released from custody. Defendant Jackson now moves for summary judgment. Plaintiff has failed to respond to the motion. The Court finds that oral argument is unnecessary. *See* W.D. Mich. LCivR 7.2(d).

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Whether a fact is "material" depends on "whether its resolution might affect the outcome of the case." *Harden v. Hillman*, 993 F.3d 465, 474 (6th Cir. 2021).

A party moving for summary judgment can satisfy its burden by demonstrating that the non-moving party, "having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the moving party makes this showing, the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006). The existence of a mere "scintilla of evidence" in support of the non-moving party's position, however, is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005).

While the Court must view the evidence in the light most favorable to the non-moving party, that party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The non-moving

party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006). Likewise, the non-moving party cannot merely "recite the incantation, 'credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353-54 (6th Cir. 2004).

Accordingly, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735. Stated differently, the "ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Harden*, 2021 WL 1257802 at *4.

## ANALYSIS

I.    Eighth Amendment

The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations that occur during imprisonment and are not part of the sentence imposed. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The Constitution "does not mandate comfortable prisons, but neither does it permit inhumane ones and the treatment a prisoner receives in prison

and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Wilson v. Williams*, 961 F.3d 829, 839 (6th Cir. 2020).

The analysis by which Plaintiff's claim is evaluated consists of two steps. First, the Court must determine, objectively, whether the deprivation Plaintiff allegedly experienced was sufficiently serious. In this respect, Plaintiff "must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. With respect to the objective prong of the analysis, contemporary standards of decency determine whether conditions of confinement are cruel and unusual. *See Hadix*, 367 F.3d at 525. Contemporary standards of decency are violated only by "extreme deprivations" which deprive the prisoner of the "minimal civilized measure of life's necessities." *Ibid*.

If the objective test is met, the Court must then determine whether Defendant acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. In other words, was Defendant deliberately indifferent to Plaintiff's health or safety. *Ibid*. However, the Eighth Amendment is not implicated where prison officials simply acted with negligence. *See Perez v. Oakland County*, 466 F.3d 416, 423 (6th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)). Rather, Plaintiff must "present evidence from which a trier of fact could conclude 'that [Defendant] was subjectively aware of the risk' and 'disregard[ed] that risk by failing to take reasonable measures to abate it.'" *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004).

Defendant concedes that, in light of the risks posed by COVID-19, the objective prong of the analysis is satisfied. *See, e.g., Wilson*, 961 F.3d at 840 (when prisoners challenge an official's actions vis-à-vis COVID-19, the objective prong is "easily satisfied" given the significant health risks posed by COVID-19). With respect to the subjective prong, however, Defendant argues that his, and the MDOC's response, to the COVID-19 pandemic was reasonable. The evidence submitted by Defendant reveals the following.

On March 10, 2020, Michigan Governor Gretchen Whitmer declared a State of Emergency after the Michigan Department of Health and Human Services (MDHHS) "identified the first two presumptive-positive cases of COVID-19 in Michigan." (ECF No. 49-5, PageID.325-26). On March 11, 2020, the MDOC announced "a series of measures to protect its staff, the prison population and the community." (ECF No. 49-7, PageID.358, 380-81). Specifically, the MDOC announced that "anyone coming into a prison facility will be asked a series of screening questions and may have their temperature checked before being allowed entrance into a prison. This includes all staff, visitors, volunteers and contractors." (ECF No. 49-7, PageID.380). The MDOC also announced that "[i]n communities where there are outbreaks, the [MDOC] will consult with the local health department and the [MDHHS] and will potentially disallow all visits and outside contact from anyone other than MDOC personnel." (*Id.*). The MDOC further announced that "[i]nformation on prevention is being provided to the prison population and MDOC staff. For the past week, facilities have undergone additional and more frequent cleaning." (*Id.*).

On March 13, 2020, the MDOC announced that it "will cease in-person visiting of prisoners effective immediately for the safety of staff, prisoners, and the public." (ECF No. 49 at PageID.359, 383). On March 16, 2020, the MDOC posted on social media information and responses to commonly asked questions regarding the MDOC's response to COVID-19. (ECF No. 49-7, PageID.359, 385-91).

On March 23, 2020, the Centers for Disease Control (CDC) published its Interim Guidelines for Correctional Facilities. (ECF No. 49-7, PageID.360). The "best practices" outlined by the CDC were things the MDOC was already doing. (ECF No. 49-7, PageID.360-61). On March 29, 2020, Governor Whitmer issued an Executive Order which "immediately halted all transfers from county jails and local lockups to [the] MDOC." (ECF No. 49-7, PageID.361). This Order further provided that the MDOC "must continue to implement risk reduction protocols to address COVID-19. . .which [the MDOC] has already developed and implemented at the facilities it operates." (*Id.*).

On April 8, 2020, the Director of the MDOC issued a Director's Office Memorandum (DOM) which outlined "the precautions staff shall take to help prevent COVID-19 from spreading." (ECF No. 49, PageID.361-68, 393-400). The memo addressed the measures and precautions being enacted in several different categories including: (1) personal protective equipment (PPE); (2) screening of individuals before entering a facility or office building; (3) social distancing; (4) isolation areas; (5) prisoner personal property; (6) personal hygiene and housing unit cleanliness; and (7) food service.

Some of the specifics outlined in the memo included that "all staff and prisoners shall always wear a mask." (ECF No. 49-8, PageID.393). The memo identified circumstances in which additional personal protective equipment (PPE) must be worn and indicated that "all individuals" must be screened for "potential signs and symptoms" of COVID-19 before entering any correctional facility or office building. (*Id.*). Moreover, any person "who shows symptoms of COVID-19 shall be denied entry" and "employees who are feeling sick with any illness must stay home." (*Id.*). The memo mandated that the CDC's social distancing recommendations "shall be followed at all times." (*Id.*, PageID.393-94). Prisoners testing positive for COVID-19 "shall be placed in quarantine in a designated isolation area as soon as resources permit regardless of their security level or prior criminal history." (*Id.*, PageID.394). "Adequate soap shall be provided to prisoners at all times" and "[b]leach is permitted to be used and stored in the housing units, and other areas of the facility as determined by the Warden." (*Id.*, PageID.397). The Director of the MDOC revised this memo 13 times between May 13, 2020, and January 25, 2021, updating and refining the MDOC's approach to addressing the challenges presented by the COVID-19 pandemic.

The Director of the MDOC has submitted an affidavit in which she asserts the following. As of April 6, 2020, the MDOC distributed more than 150,000 reusable cloth masks to staff and prisoners. (ECF No. 49-7, PageID.369). The MDOC is "reducing the number of prisoners housed in communal living arrangements (dorm-style settings or 'cubes') to the fullest extent feasible to further promote social distancing." (*Id.*,

PageID.370). Portable showers are being utilized to "minimize movement of prisoners through the housing units and avoid contact with other cohorts to minimize individuals congregating in shower areas." (*Id.*, PageID.370-71). The MDOC has established COVID-19 response units which house and treat prisoners with COVID-19 "separately from the rest of the prison population to contain the virus." (*Id.*, PageID.371).

The MDOC provides COVID-19 testing "at all facilities in accordance with CDC guidelines." (*Id.*, PageID.372). The Michigan National Guard has also assisted the MDOC test inmates for COVID-19. (*Id.*). Prisoners who contract COVID-19, as well as prisoners who are suspected of having COVID-19 or who are considered "close contacts" of somebody who contracts COVID-19, "are closely monitored and assessed daily in accordance with CDC guidelines." (*Id.*, PageID.373). To ensure compliance with CDC guidelines and the MDOC's COVID-19 protocols, the Director conducts daily meetings with the Deputy Directors, Assistant Deputy Directors, and the Healthcare Administrator and "other top-level staff" to assess the MDOC's "ongoing COVID-19 response." (*Id.*). Additionally, "all MDOC facilities, through their Wardens, provide a daily update that is distributed to the Executive Team addressing all COVID-19 related developments." (*Id.*).

Defendant Jackson has submitted an affidavit in which he asserts the following. In his capacity as Warden, Jackson complied with the MDOC's COVID-19 policies and protocols, including the MDOC Director's Office Memorandum (DOM). (ECF No. 49-2, PageID.283). Jackson "instructed [his] staff to comply with MDOC policies, protocols,

and DOMs related to COVID-19, and relied on them to ensure compliance with COVID-19 protocols such as masking and social distancing requirements within the prison population." (*Id.*). The "entire LRF prisoner population and staff were provided with reuseable face masks no later than April 6, 2020." (*Id.*, PageID.284). Porters "regularly cleaned the housing unit and additional cleaning supplies were available to prisoners to wipe down their areas of control and frequently used surfaces such as telephones." (*Id.*). The first prisoner at LRF "to be confirmed to have COVID-19 tested positive on October 20, 2020," making LRF "one of the last MDOC correctional facilities to have confirmed COVID-19 cases within [its] prisoner population." (*Id.*).

This evidence reveals that the response by the MDOC and Defendant Jackson was anything but indifferent to Plaintiff's, or any inmate's, health and safety. As courts recognize, in the context of COVID-19 in the prison setting, "the key inquiry is whether the defendant responded reasonably to the risk posed by COVID-19." *Clark v. Chapman*, 2022 WL 19833097 at *4 (6th Cir., Nov. 22, 2022) (citations omitted). Moreover, Defendant's actions may be deemed reasonable "even if the harm imposed by COVID-19 on inmates ultimately is not averted." *Id.* (citation omitted). Furthermore, the Eighth Amendment "do[es] not require that prison officials take every possible step to address a serious risk of harm." *Wilson*, 961 F.3d at 844.

The response to the COVID-19 pandemic by the MDOC and Defendant Jackson was as extensive, if not more so, than actions courts have found to constitute a reasonable response to COVID-19 and similar situations. *See, e.g., Wilson*, 961 F.3d at 840-44

(collecting cases). The undersigned concludes, therefore, that Defendant Jackson is entitled to summary judgment as to Plaintiff's Eighth Amendment claim.

    II.    Fourteenth Amendment

Plaintiff also alleges that Defendant's actions violated his "[Fourteenth] Amendment right to not be deprived of his life without due process of law." (ECF No. 1, PageID.5). To prevail on this claim, Plaintiff must establish that he was deprived, without adequate procedural rights, of an interest protected by the Fourteenth Amendment Due Process Clause. *See Houchens v. Beshear*, 850 Fed. Appx. 340, 342 (6th Cir., Mar. 9, 2021). While Plaintiff's life is certainly an interest protected by the Fourteenth Amendment, Plaintiff's claim fails because he was not deprived of this protected interest. Accordingly, the undersigned concludes that Defendant Jackson is entitled to summary judgment on Plaintiff's Fourteenth Amendment claim.

## **CONCLUSION**

For the reasons articulated herein, the undersigned recommends that Defendant's Motion for Summary Judgment (ECF No. 48) be granted and this action terminated. For the same reasons the undersigned makes these recommendations, the undersigned finds that an appeal of such would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the undersigned further recommends that an appeal of this matter by Plaintiff would not be in good faith.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,

Date: October 19, 2023

/s/ Phillip J. Green
PHILLIP J. GREEN
United States Magistrate Judge